```
_____
                                    )
MODERATE PARTY OF RHODE ISLAND,     )
                                    )
         Plaintiff,                 )
                                    )
         v.                         )     CA. No. 10-265 S
                                    )
PATRICK C. LYNCH, in his official   )
capacity as Attorney General for    )
the State of Rhode Island, and      )
FRANK CAPRIO, in his official       )
capacity as General Treasurer for   )
the State of Rhode Island,          )
                                    )
         Defendants.                )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

In this case the fledgling Moderate Party of Rhode Island ("Moderate Party" or "MPRI") continues its efforts to nibble at the two-party structure of Rhode Island's election laws. But the Moderate Party's partial success in knocking down one of the two barriers to party recognition in Block v. Mollis, 618 F. Supp. 2d 142 (D.R.I. 2009), does not repeat here for the reasons explained below.

Moderate Party filed a motion to preliminarily enjoin the distribution of funds from the "nonpartisan account" under Rhode Island General Laws § 44-30-2(d)(2) scheduled for September 1, 2010. The parties subsequently filed cross motions for summary

judgment. Because of fast-approaching elections, the Court held a hearing and then, on August 13, 2010, issued an order denying Plaintiff's motions for preliminary injunction and summary judgment, and granting Defendant's motion for summary judgment. That order indicated that an opinion setting forth the legal analysis supporting these rulings would be forthcoming. This is the promised opinion.

I. Background

MPRI is a political party that participated in the November 2010 elections. It was officially recognized by the State of Rhode Island in August 2009, becoming one of three parties (along with the Democrats and Republicans) entitled to this status for the 2010 election cycle.

R.I. Gen. Laws § 44-30-2(d) provides for a credit against state personal income tax for contributions to an account for the public financing of the electoral system. Under § 44-30-2(d)(1), a taxpayer may contribute five dollars (ten dollars if married and filing jointly) to this account. The first two dollars (four dollars if married and filing jointly) go to a party designated by the taxpayer or, if the taxpayer wishes, to a "nonpartisan account." The moneys contributed to the nonpartisan account are distributed, under § 44-30-2(d)(2), "to each political party in proportion to the combined number of votes its candidates for Governor received in the previous

election, after five percent (5%) of the amount in the account is allocated to each party for each general officer elected in the previous statewide election." This means the parties occupying the offices of Governor, Lieutenant Governor, Attorney General, General Treasurer, and Secretary of State receive five percent of the nonpartisan funds for each of the foregoing five offices which they occupy. This makes up 25 percent (five times five percent) of the nonpartisan fund. The remaining 75 percent goes to each political party in proportion to the number of votes its candidates for Governor received in the previous election.[1] The total amount of contributions to the parties and the nonpartisan account cannot exceed $200,000. R.I. Gen. Laws § 44-30-2(d)(1). The remainder goes to the State's general revenue fund. Id.[2]

---

[1] It is possible to interpret the quoted language from § 44-30-2(d)(2) differently – to provide for the distribution of 20 percent (rather than 25 percent) of the nonpartisan funds to the parties holding each of the five "general officer" posts except for Governor, and to have the remaining 80 percent (rather than 75 percent) go to the parties in proportion to the number of votes they received for Governor in the past election. This is the interpretation MPRI initially chose. (See Compl. ¶ 10.) However, in their Statement of Agreed Upon Facts (¶ 5), the parties have submitted the interpretation supplied in the main text above. The Court expresses no opinion as to which interpretation is correct. Nothing in this case depends on it.

[2] R.I. Gen. Laws § 44-30-2(d) reads, in its entirety:

(1) There shall be allowed as a credit against the Rhode Island personal income tax otherwise due for a taxable year, commencing for the tax year 1988, a

3

MPRI contends that the statutory distribution scheme for the nonpartisan account violates the First and Fourteenth Amendments to the Constitution, because it relies on one- to four-year-old election results and does not make any provision

> contribution of five dollars ($5.00), or ten dollars ($10.00) if married and filing a joint return, to the account for the public financing of the electoral system. The first two dollars ($2.00), or four dollars ($4.00) if married and filing a joint return, shall go to a political party as defined in § 17-12.1-12 to be designated by the taxpayer or to a nonpartisan account if so indicated up to a total of two hundred thousand dollars ($200,000) collectively for all parties and the nonpartisan account. The remainder shall be deposited as general revenue.
>
> (2) The credit for the public financing of the electoral system shall appear on the face of the state personal income tax return. The tax administrator shall annually forward by August 1, all contributions to said account to the state general treasurer and the treasurer shall annually remit by September 1, the designated partisan contributions to the chairperson of the appropriate political party and the contributions made to the nonpartisan general account shall be allocated by the state general treasurer to each political party in proportion to the combined number of votes its candidates for Governor received in the previous election, after five percent (5%) of the amount in the account is allocated to each party for each general officer elected in the previous statewide election. Each political party may expend moneys received under this provision for all purposes and activities permitted by the laws of Rhode Island and the United States, except that no such moneys shall be utilized for expenditures to be directly made or incurred to support or defeat a candidate in any election within the meaning of chapter 25 of title 17, or in any election for any political party nomination, or for political party office within the meaning of chapter 12 of title 17. The remaining funds shall be allocated for the public financing of campaigns for Governor as set forth in §§ 17-25-19 - 17-25-27.

for parties recognized between the previous election and the time of the distribution. This, says MPRI, amounts to an unconstitutionally discriminatory state subsidy to the established Democratic and Republican parties to the detriment of fledgling parties like MPRI. Such state-sponsored assistance allegedly undermines the ability of newly recognized parties to compete against established parties on an equal footing. Accordingly, the Moderate Party requested that the Court declare the statutory scheme for the distribution of funds in the nonpartisan account unconstitutional and enjoin the distribution that was scheduled to occur by September 1, 2010.

II. Threshold Defenses

The State argues that threshold defenses of res judicata, nonjoinder, and unclean hands justify dismissing MPRI's claims before reaching their merits. These arguments are unavailing. Res judicata does not apply because MPRI's challenge to the constitutionality of R.I. Gen. Laws § 17-1-2(9) in Block v. Mollis, while implicating election laws generally, plainly involved different issues than those raised in this case. See Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 34 (1st Cir. 1996) (holding that for res judicata to apply, there must be "(1) a final judgment on the merits in an earlier action, (2) sufficient identity between the causes of action asserted in the

earlier and later suits, and (3) sufficient identity between the parties in the two suits").[3]

As for nonjoinder, the Moderate Party, at this Court's suggestion, contacted the Democratic and Republican Parties to inquire whether they would be interested in participating in this suit. Neither responded affirmatively. Finally, the State has not made the necessary showing of unreasonable delay and prejudice for the defense of laches, or of bad faith for the defense of unclean hands. See Dobson v. Dunlap, 576 F. Supp. 2d 181, 187 (D. Me. 2008) ("[L]aches is an affirmative defense and a defendant claiming laches has the burden of proving both unreasonableness of the delay and the occurrence of prejudice.") (internal citations and quotation marks omitted); Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) (discussing bad faith and unclean hands).

III. The Merits

    A. Standard of Review

In assessing the constitutionality of election laws, the Supreme Court has abandoned the categorical use of strict scrutiny in favor of "a more flexible measuring stick." Block,

---

[3] Moreover, when the Moderate Party brought the first action, it was not a recognized political party but "an unincorporated voluntary association of citizens" aspiring to become a recognized party. Block v. Mollis, 618 F. Supp. 2d 142, 145 (1st Cir. 2009). At that stage, it probably would not have had standing as a recognized political party to bring the present action.

618 F. Supp. 2d at 149 (citing Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)); see also Burdick v. Takushi, 504 U.S. 428, 433-34 (1992) (rejecting the invitation to "subject every voting regulation to strict scrutiny" and applying instead "a more flexible standard"). As this Court explained in Block, 618 F. Supp. 2d at 149:

> This test prompts the Court back and forth on a sliding scale, where the applicable level of scrutiny corresponds to the constitutional burden: the lighter the burden, the more forgiving the scrutiny; the heavier the burden, the more exacting the review. When a law imposes only reasonable, nondiscriminatory restrictions on individual rights, the burden is slight, and the State's regulatory interests are, in the normal course, sufficient to justify the constitutional restraint. Burdick, 504 U.S. at 434. However, if the restrictions are severe, the burden is great, and the law must be narrowly drawn to advance a "state interest of compelling importance." Norman [v. Reed], 502 U.S. [279,] 289 [(1992)].

The balance, then, pits the state's interest in the regulation of elections against the burden imposed on the plaintiff's First and Fourteenth Amendment rights. Id. In striking this balance, the Court must first consider the character and magnitude of the burden imposed on a plaintiff's rights, then evaluate the precise state interests advanced as justifications for imposing the burden. Id. "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the

7

extent to which those interests make it necessary to burden the plaintiff's rights."  Anderson, 460 U.S. at 789.[4]

B.   Constitutional Challenges to State Election Laws

In assessing the Moderate Party's challenge to the distribution of the nonpartisan fund, this Court is guided by Buckley v. Valeo, 424 U.S. 1 (1976), the Supreme Court's seminal pronouncement on the constitutionality of distributions made pursuant to a scheme for public financing of elections.  One of the issues in Buckley was a challenge to the constitutionality of Subtitle H of the Internal Revenue Code (IRC), 26 U.S.C. § 9001 et seq., which provided for public funding of presidential nominating conventions and general election and primary campaigns.  Subtitle H allocated the funding according to three categories:  (1) "Major" parties--i.e., those whose presidential candidate received 25 percent or more of the vote in the most recent election--were to receive full funding; (2) "minor" parties--those whose candidate received between five and 25 percent of the vote in the most recent election--were to receive

---

[4] In adopting this standard (again), this Court is mindful that the Second Circuit, purportedly following Buckley v. Valeo, 424 U.S. 1 (1976), recently adopted a newfangled, two-step standard of review in a similar context in Green Party of Connecticut v. Garfield, 616 F.3d 213, 229 (2d Cir. 2010). Although the Court finds the Second Circuit's discussion of the substantive ruling of Buckley accurate and helpful (see infra at 11-12), it declines to adopt the standard of review fashioned in Green Party, and remains faithful to the well-established standard of review of state election laws outlined above.

partial funding; and (3) "new" parties, meaning all other parties, were to receive no pre-election funding. Buckley, 424 U.S. at 87-88. There were other eligibility criteria, strings attached, and expenditure limits. See id. at 88-90.

In upholding the constitutionality of Subtitle H, the Court began with the general proposition that public financing of elections "furthers a significant governmental interest." Id. at 96. It further held that – in view of important governmental interests against "funding hopeless candidacies with large sums of public money" and "providing artificial incentives to splintered parties and unrestrained factionalism" – it is permissible to condition the receipt of public funding on a "preliminary showing of a significant modicum of support." Id. at 96 (quoting Storer v. Brown, 415 U.S. 724, 736 (1974), and Jenness v. Fortson, 403 U.S. 431, 442 (1971)).

For the same reasons, "the Constitution does not require Congress to treat all declared candidates the same for public financing purposes"; quite the contrary, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." Buckley, 424 U.S. at 97-98 (quoting Jenness, 403 U.S. at 441-42). So Congress is not required to finance "every nascent political group" just because it "chose to finance the efforts of the major parties."

Buckley, 424 U.S. at 98 (quoting Am. Party of Texas v. White, 415 U.S. 767, 794 (1974)).

The challengers in Buckley disputed Congress' reliance on votes received in the past election to determine the parties' eligibility for public funding, and suggested alternatives such as qualification by petition or by opinion polls. The Supreme Court held that "popular vote totals in the last election are a proper measure of public support" and that "Congress was not obliged to select instead from among appellants' suggested alternatives" in view of their higher administrative burdens. Id. at 99-100.

Similarly, the Court said of the challenge to the five percent vote threshold for obtaining general election funding that "the choice of the percentage requirement that best accommodates the competing interests involved was for Congress to make. . . . Without any doubt a range of formulations would sufficiently protect the public fisc and not foster factionalism, and would also recognize the public interest in the fluidity of our political affairs. We cannot say that Congress' choice falls without the permissible range." Id. at 103-04.

The Buckley Court also observed that the non-major-party challengers had made no showing that the public funding plan reduced their strength relative to major parties as compared

with a scenario of no public funding.  Id. at 98-99.  Rather, "[a]ny risk of harm to minority interests is speculative due to our present lack of knowledge of the practical effects of public financing and cannot overcome the force of the governmental interests."  Id. at 101.

The Second Circuit recently had occasion to interpret Buckley, and distilled the following principles from it:  (1) a public financing scheme may condition receipt of public funds on a showing of significant public support; (2) there is a range of permissible qualification criteria for receipt of public funds, and a court must defer to the legislature's choice of criteria as long as they fall within the permissible range; (3) to demonstrate an unfair or unnecessary burden on the exercise of their constitutional rights, minor party challengers must show that the public funding system would reduce their strength relative to major parties below the level it attained before the system was put in place; and (4) the showing that the minor parties' strength has been reduced cannot be made by speculative reasoning and must instead rely on evidence of the practical effects of the public funding system.  Green Party of Connecticut v. Garfield, 616 F.3d 213, 233-34 (2d Cir. 2010). This Court finds that these principles accurately reflect the analysis in Buckley, and adopts them here.

C. The Moderate Party's Challenge

The Court must apply the principles of Buckley under the flexible standard of review of state election laws. This analysis starts with an assessment of the burden the financing scheme imposes on MPRI. Buckley dictated that a plaintiff challenging a public funding scheme must demonstrate that the scheme reduces its relative strength below the level it would attain in the absence of public financing. Buckley, 424 U.S. at 98-99. Here, the Moderate Party is challenging not the totality of the Rhode Island public funding scheme but only the formula for the distribution of the nonpartisan fund. Thus, under Buckley, it must show that it is operating at a strength below what it would attain in its absence. This is not as simple a question as it may appear at first blush. It would not do simply to enjoin the distribution of funds in the nonpartisan account; they must be distributed some way. After all, taxpayers are contributing their money for "the public financing of the electoral system," R.I. Gen. Laws § 44-30-2(d)(1), not to state coffers in general. In other words, MPRI claims it is harmed by this distribution scheme--but, as compared to what scheme?

This is a question MPRI does not answer, so the Court is forced to speculate as to the hypothetical scenario that would obtain under alternative distribution systems. But speculation

is what Buckley cautioned courts to avoid, requiring instead that the plaintiff put forth specific evidence of harm. 424 U.S. at 101. MPRI has failed to do so.

The Moderate Party might argue that even if there is no evidence of harm to minor parties in general, the current distribution formula, based as it is (partly) on the percentage of votes garnered in the last election, will always disadvantage parties that did not exist at the time of the last election. The Moderate Party does not dispute that it is constitutional to tie the receipt of campaign funds to a showing of popular support. But it argues that it has already made this showing by collecting enough signatures to qualify as a political party in Rhode Island, whose requirements for party qualification "remain among the toughest in the nation." (Pl.'s Mot. for Temporary and/or Prelim. Inj. Relief 10, ECF No. 2.) State interests "such as stability in the political system and avoiding splintered parties, ballot clutter and confusion," argues MPRI, "are addressed by the party qualification process and MPRI has already fulfilled its obligation to demonstrate a significant modicum of public support." (Id. at 9-10 (internal quotations and citation omitted).)

But it is not for the Moderate Party to ordain the method by which the state gauges popular support. Rather, the choice from among "a range of formulations" is left to the legislature.

Buckley, 424 U.S. at 103-04. Moreover, Buckley held specifically that "popular vote totals in the last election are a proper measure of public support," and found that Congress was justified in choosing this measure of popularity over others because "the alternative of petition drives presents cost and administrative problems in validating signatures, and the alternative of opinion polls might be thought inappropriate since it would involve a Government agency in the business of certifying polls or conducting its own investigation of support for various candidates, in addition to serious problems with reliability." Id. at 99-100. The bottom line is that it is not too much to expect new parties to demonstrate their popularity, and hence their entitlement to public funds, the way every other party must: by getting votes in elections. And if they have to wait one election cycle before they have the opportunity to prove their mettle, that is a minor burden, and certainly not enough to make the law unconstitutional – particularly in view of the fact that there is no feasible alternative.

In sum, MPRI's challenge fails on all four Buckley principles: (1) The state permissibly conditioned the receipt of public funds on a showing of public support; (2) the state's method of gauging public support by looking at who occupies the general officer positions in Rhode Island and who received more votes in the last gubernatorial election was within the range of

14

permissible qualification criteria. On this score the state's position is much stronger than in the usual case where a court defers to the legislature's choice of one among various viable methods, some of which the court might prefer as a matter of policy. In this case, MPRI does not suggest any alternatives, let alone a range of viable ones; (3) MPRI has not put forth any evidence that the distribution criteria in R.I. Gen. Laws § 44-30-2(d)(2) operate to reduce its strength relative to major parties below the level it would attain before the system was put in place; and (4) To the extent MPRI has made any showing of harm and reduction of strength, the showing relies on speculation as to de minimis harm, not on evidence of the practical effects of the public funding system. Therefore, MPRI's challenge to R.I. Gen. Laws § 44-30-2(d) must fail.[5]

---

[5] MPRI urges that three district court decisions command a contrary result: Socialist Workers Party v. Rockefeller, 314 F. Supp. 984 (S.D.N.Y. 1970), summarily aff'd, 400 U.S. 806 (1970); Greenberg v. Bolger, 497 F. Supp. 756 (E.D.N.Y. 1980); R.I. Chapter of Nat'l Women's Political Caucus, Inc. v. R.I. Lottery Comm'n, 609 F. Supp. 1403 (D.R.I. 1985). While these decisions all struck down as unconstitutional statutes discriminating between major and minor parties, they are all distinguishable from the present case. To begin with, and most obviously, none of them involved public financing of election campaigns. Second, these cases were decided before the Supreme Court elaborated the proper standard of review of election laws in Anderson v. Calebrezze and Burdick v. Takushi, and they applied strict scrutiny or something akin to it. (Nat'l Women's was decided after Anderson but before Burdick.) With the benefit of Anderson and Burdick, application of this standard appears unwarranted. See supra Part III.A. Finally, the result in Greenberg was based largely on the strong nexus between access

IV. Conclusion

For the foregoing reasons, Plaintiff's motions for preliminary injunction and summary judgment are DENIED, and Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
U.S. District Judge
Date: February 9, 2011

---

to the mails and the ability to exercise the freedom of expression guaranteed by the First Amendment, a consideration not present in this case. See 497 F. Supp. at 774-75, 778.